Case number 21-39-4. United States of America v. Lamont Johnson, also known as Black, at balance. Mr. LaCarre, for the at balance. Ms. Scali, for the appellate. Good morning, counsel. Mr. LaCarre, please proceed when you're ready. Thank you. Good to see you all. As the court is aware from our briefs, this is not a routine sentencing case. It's a de facto life sentencing based on constitutionally unreliable information. In the limited time I have, I hope you'll indulge me perhaps 90, a minute to 90 seconds to give you my three court theories, if that's possible. The first issue I want to talk about is the relevant conduct. The government doesn't really seek to justify, but just does its finding that Mr. My client had the days and multiple discussions of multi-gallon purchases of PCP. That's simply unfounded. We have put all the relevant text in the evidence. So no cooperation in the appendix. No cooperator testified at the trial. No cooperator testified at the sentencing, even though those cooperators are clearly under the government's control. What the government has done here is switch forces. They want you to become a court of first view, not a court of review. They want you to decipher near incomprehensible coded conversations and try to figure out what happened several years ago. They, in fact, want you to reward them, reward them for not calling any of the cooperators at the trial or at the sentencing. And I don't think the courts do that. They also want the court to consider profiters. What the law declares is notoriously unreliable profiters, inculpatory statements of codependents that were not presented below the district judge. Now, we've rejected that. That's just not that's not fair. That's something that should have been explored below. If they didn't want to call the cooperators, I can I can understand that. That's the responsibility of the government. It's their burden to establish relevant conduct. And our position is quite simply, this is a Stover case. This is a case of the United States versus Daniel Stover that we cited in our brief. Second, it should be remanded as a proper fact finding. The role of the offense, that's a simple one. This case does not meet any of the criteria that the courts typically rely on, that the courts of appeals typically look to to decide what somebody's role is in the offense. Now, in this case, if you look at the government's pre-sentencing memorandum, they depict Mr. Johnson as the drug supplier for the entire Jahi Marshall drug trafficking organization. That's what they put in there. It's in the record in their sentencing memorandum. Now, if Mr. Johnson was a supplier for the entire network, how could it have thrived when he was unambiguously collecting drugs, unable to pay the rent, unable to meet his card numbers? It doesn't make sense. He didn't recruit anybody. He never met Jahi Marshall. He wasn't on the scene. He didn't share profits. At the best, their argument then shifts to, well, maybe he controlled his co-venturer. But the law is, you don't control your co-venturer. So I do have a question or two about this part of the case, the managed supervisor one. But can we go back to the drug quantity for where you started? So I take it you don't disagree with the what the government says at page 49 of its brief in terms of the quantities. In other words, if it's true that there was a gallon involved and then eight ounces and then 16 apiece, that that amounts to over three kilograms. The question is, I do disagree. No, I'm just talking about the math. Well, I want to talk about the math because that's a valid question. I'm glad you agree. So I guess I'm surprised that you disagree with that. Well, what I what I took to be the principal submission is that there's just not evidence that supports the amounts. Not that the amounts don't translate into three kilograms. Maybe maybe I'm wrong about that. But on whether the evidence supports the amounts. And it seems like the big question is the one gallon is whether there was, in fact, one gallon that came from the West Coast. If you get to level 32, you have to get that to have three gallons more pure PCP. I'm sorry. Three gallons of a mixture containing PCP. They don't have that. How do you how do you why do you say three gallons in the expert testimony? Twenty two grams per fluid ounce. Here's the problem. That's his testimony. But here's what he missed. First of all, let me give them the gimmick. What they see is from Johnson's car. That's one point four or five kilograms. That's about that's about essentially 90 ounces. If you do the mathematics and I did it, I've done a calculation table last night. If you gave them if you gave them the 40, 40 ounces was evidence doesn't support. If you gave me there's a mixture of 40 ounces of PCP. You still come out under what you need for three kilograms or more of a mixture. So the math doesn't add up. This is another reason. I want to I want to answer, though, to the to the question of do you think that it's clear error for the district court? If the district court relied on 22 grams per fluid ounce, that that was clear. And if so, why? Well, first of all, that seems standard review. Do I think it's clear? Absolutely. But I also think you should give the entire methodology a fresh look. As a majority of circuit courts of appeal do, this court has never directly ruled on methodology. And I've urged in my opening brief this and my reply, there should be a de novo standard review. And the fact of the matter is the judge's findings. When you read the sanctioned transcript, they just don't make sense. The way he approached it, there was some confusion in the record. Tell me why 22 grams per fluid ounce. Even if we review this de novo, shouldn't be used. And where was that contested below the which grounds are 22 grams per fluid ounce? We've got to we've got to convert from liquid. In ounce gallon measurements to grams and kilograms for the purpose of the sentencing tape. In the sense of memory below, we did contest the method. He did contest the amount. And if you if you calculate, if you look at a mixture, if you take a mixture. PCP, is that what they got? Wasn't your PCP? If you have one point four or five kilograms that computes out essentially just about 50 ounces. If you gave them if you gave them 40 ounces, it still wouldn't get them to where they're looking. How are you doing that? What what unit of ratio is kilogram ounces conversion on? Kilogram to ounces by fluid ounces or by weight. The problem is that that a gallon is one hundred and twenty eight ounces, but that's fluid out. So that that that that is not the same as how many ounces in weight. A gallon of milk or a gallon of water, a gallon of PCP weight. The problem is it's a mixture. It's not pure PCP. There are two alternatives. You have three hundred grams of pure PCP. That's the fact that you're level 32. If you have a mixture, you have to have three gallons or more of a mixture to get to level 32. As the Barrow's case that we cite in our brief said, caution has to be taken when you when you look in a corner. And what the district judge's core finding was that they shifted on. His core finding was that there are multiple discussions, the multi gallons of PCP. Your brief, your brief page for opening brief says, because based on the intercepted conversations that he was seeking a gallon, your brief acknowledges that. I think that's right. But there are multiple conversations concerning multiple gallons. So I guess I guess. If if if he was seeking a gallon in the record supports that he got a gallon in the beginning of October. And then there were a couple prior sales of eight ounces, 16 ounces. If you add that gallon to those prior sales and used 22 grams per fluid ounce conversion, then you're over three. Here's the problem. Wait, hold on. Am I misreading the doesn't the. Doesn't the expert testimony in this case, which I think is undisputed, it says that a gallon. Plus 16 ounces is more than three kilograms. Am I reading that wrong? I'm sorry. The undisputed expert testimony in the case you said there was nothing in the record that supported. But the undisputed expert testimony in the case says that a gallon plus 16 ounces is more than three kilograms. What am I reading that wrong? No, you're not. That may be undisputed expert testimony, but that's based on the assumption that all of the transactions were sales. They're at the key issue here, but you just you, you, in response to Judge Wilkins, you, you, you admitted and you said in your brief that the wire taps show at least one gallon show gallon. And later, the wire tests also show also show the 16 ounces. And those are both in your brief. You can see the wire tap show both of them. And then you have an expert who says those two add up to more than three kilograms. There's a mistake here. What I'm saying is, wait, where's the misstatement? The mistake is the expert's testimony is based on the assumption that there were prior sales in late July, July 26th, 28th. That was there was a very coded discussion that nobody can decipher. You can't figure out what happened here. There's no. The people who were engaged in those coded discussions. Specifically, and, and, and, and we're never called by the government to testify. Nobody testified about what we experts. There's evidence about what, what the coded discussions, man. You know, maybe that testimony was reliable. Maybe it wasn't. It came in. And the jury must have found it credible because they, they convicted your client and you're not making a sufficiency or any other argument challenging the conviction. So, if, if, if the coded, the coded discussions were sufficient to justify conviction, why aren't they sufficient to justify a sentence? Because of all the inspections, you're looking at the long end of the telescope. Again, the 1.4 kilograms that, I'm sorry, the 1.4 kilograms that were seized in October. That's a gimmick. The jury finding was one kilogram more. There was a discussion below in the record. Should we have specific jury findings as to the quantity? The government decided not to go for that. They went with one kilogram more. So, of course, the jury found one kilogram more. You know, let's be realistic. That was what was seized. The question, what this case turns on is the difference between what was seized and those amorphous conversations that the district judge's findings just don't address. His findings are, quote, there were multiple discussions throughout the case, multi-gallon deals. There is no such discussion. I have spread every single one of those texts in the record. There are nobody testifying to support that. It was the expert whose testimony is based on his own assumption. It was his assumption. His testimony is based on conversations where he's saying, slim or short, he's going to get me a hole or I'm going to get a hole this time. And then testimony that usually comes in a gallon, sometimes in a half gallon, and the inference being that if he's saying a hole, then he's referring to a gallon. Why is that unreliable for the purpose of making a sentencing? It's, as I've said, the district judge didn't make a correct finding here. These are coded discussions that nobody, the actual participants, the people who were best situated to know what happened were not called by the government. So there might be, I mean, maybe it's true that there could be better evidence. But the question that we're reviewing is whether it was clear error to find that the three kilogram threshold was found. And as I read the government's brief, the three kilograms, the biggest amount that gets you to three kilograms is the one gallon PCP shipment from the West Coast. That's the bulk of it. That's $2,700 per the government's calculation on page 49 of its brief. Can I just finish? For the government's calculation on page 49 of its brief. So if there is, if it's not clear error to think that there's a gallon, according to the government's calculation, that gets you to 2,700. That's pretty close to three kilograms. Now, I'm going to assume, you can contest it, but I'm going to assume that the 22 ounce ratio is okay. I'm just going to assume it for purposes of this question. Let's just assume that that's okay. I guess the question then becomes, is there actually enough evidence that there was one gallon? Because that gets you pretty close on the 22 ratio, the 22 gram ratio. And on the question of whether there is, in fact, one gallon, there's enough evidence of the one gallon. I guess my question is, as Judge Wilkinson, as Judge Wilkins said, there's the reference to a whole one that was stated by Johnson. And then there's the testimony from the government's expert at page 590 of the joint appendix that says, typically, at least a gallon is shipped from the West Coast. So why don't the combination of those at least suffice to show that it wasn't clear error to think that there's a one gallon amount from the West Coast? And if there's a one gallon amount from the West Coast, then per the 22 gram ratio, which I'm assuming is okay, that gets you pretty close in and of itself to 3 kilograms. It's pretty close, but it's close. It's like horseshoes and hand grenades. You've got to be right on. It's not quite there. Okay, so then let's – you may think that there's not enough other stuff, and maybe we can talk about that. But I just want to know, what's wrong with that to get you to 2,700? Assuming that the math, the 22 gram ratio is okay, what's wrong with that construction of why there's, in fact, a gallon? I think what's wrong with it is that there's no testimony or anything – there's no real testimony other than a casual reference and what sees. And what sees isn't enough. No, but there's not just that, because there's the reference to a whole one that Johnson – that's in the record. And then there's the testimony from the government's expert from the West Coast, typically at least a gallon. And the testimony, as I recall, was to the effect of no one's going to bother to get something from the West Coast unless it's a pretty good quantity. So typically it's at least a gallon. So you get that plus the whole one, and that gets you to a gallon, which gets you to 2,700, which gets you to pretty close. Then there may be a debate about whether you can get past the 3 kilograms, but I just want to know what's wrong with getting us pretty close. I think what's wrong with it is that there's no – the actual participants weren't called, the people who knew, who were in a position to know what happened. Theoretically, you assume we're not called to testimony. This court is sitting here trying to guess what happened and trying to – is there a discussion of a whole one? Yes, I'll grant you that. And do you think a whole one means a whole gallon? No, I'm not saying that's a whole gallon. For all I know, it's a mixture of something. But I know what the expert testified. The problem is that what the government is, again, asking you to do is to make the decision that should have been made below by the district court. And the district court's view was mistaken, that there were multiple discussions throughout the whole case of multiple gallons of PCTA. So your argument is that the finding that was made by the district court was that there were multiple discussions of gallons, and there's no evidence for that, and we can't reconstruct the finding on appeal to one that comports with the defensible view of the evidence. We don't have to vacate the sentence and send it back. Not only was that my argument, but I'll tell you one better. Who caused that problem? It was caused by the government. It was their sentencing memorandum and their position at the sentencing that he was the supplier for this whole network. That's just physically impossible. There was a guy referenced in the record to a guy who was a supplier named Eric Scott in the spring. My client happened to be picked up at the very tail end of a two-and-a-half, three-year investigation. And what happened was they overheard him on a wiretap, and they had what the law recognizes as confirmation bias. He's showing up late. Ah, he's the guy who must be the main supplier. But he wasn't. There's no evidence of that. What happens here is essentially surmised in conjecture as to what the relevant conduct is. Yes, and it is a departure. Let me ask you a question about the enhancement for supervisor or manager. Sure. With respect to Ms. Johnson, if there's evidence that she didn't really want to be involved with drugs at all, but he compelled her to do so by calling her, badgering her, et cetera, why isn't that control? I mean, control is getting someone to do something that they don't want to do. You're controlling. Well, first of all, if it were Ms. Johnson alone, it would be a two-point enhancement, not a three-point enhancement, because he clearly had nothing to do with the Marshall Ring. He's not their supplier. He's an independent trader. But with respect to Ms. Johnson— Why is it only a two-point enhancement? Because she's the only person he's dealing with. You have to look at hierarchy. But aren't there five people or more total that are involved in the conspiracy? Under Graham and under Weaver. It's a Seventh Circuit case that I submit is actually elegantly written. In both two cases, what one looks to is there a hierarchy. The only hierarchy in that case would be he and Mrs. Johnson. But there is no hierarchy of he and Mrs. Johnson. It's a one-off episode. She was perfectly happy to get that gun out of the house, let's be realistic, and get that cooking stuff out of the house. But there's no evidence in the record that she was a participant in that. And I suggest the Mankiewicz case out of the Seventh Circuit, which is discussed in a pretty brief. In Mankiewicz, the son ran a large marijuana operation. He asked his father, would you put some of the bales in the other side of the barn? His father said, yeah, sure. Okay, I'll be happy to do that. That's how the managerial— Was anything found in the premises of Mrs. Johnson as far as drugs? Boy, that's a good question. I don't remember. Perhaps it's—I'm certainly in the inventory of the trial transcript. I'd be happy to submit something. Yeah, I'm just—the search warrant that was executed was not at the residence that she lived. Yes, it was. Is that what you're saying? I think it was. Well, that's kind of my point, is that the wiretaps appear to show that she didn't want to be associated with any of this. And yet the stuff is found at her house. That would imply that it was put there kind of against her will. She didn't want it. And that would imply control. No, control—what control requires is more than a one-off situation. And that's the Weaver case. What control requires is a sort of a continuous situation where one has economic coercion over somebody else. There's no showing that she's a participant getting money for this. There's no showing that she's doing anything to facilitate the offense. The fact that her husband may have used the house to store PCP, which we know PCP dealers tend to do, that doesn't make her a participant. Judge Hogan did not—couldn't have been there for running a crack house—I'm sorry, for a PCP house. That's an important fact. He recognized the house wasn't being used for anything other than perhaps storage. And that's done by him, not by Karen Jones. She's not a participant. Because what the law of participation requires is more, as I said, than a one-off episode. It requires acquiescence. It requires dealing over time and furthering the offense. She's his wife. She wasn't happy about this. But that doesn't make her a participant. Commissioner, my colleagues don't have additional questions at this time. We will give you some time for rebuttal. One last question. Whose name was on the lease? I'm sorry, Your Honor? What's the evidence about whose name was on the lease? In the lease? Well, I don't want to guess. I would assume both. I'm a little leery about making assumptions. Rather shabby apartment, the depiction. Probably rather a big scale drug dealer. Thank you, counsel. Ms. Kelly. Good morning, Your Honors. May it please the Court. Katherine Kelly on behalf of the United States. Your Honors, in this case, the District Court properly found by a preponderance of the evidence that there was indeed support for a level 32 drug quantity, that Mr. Johnson was indeed a manager or supervisor and thus was entitled or subject to the enhancement, and that the credible threats enhancement properly applied in this case. So can we start with the drug quantity? Certainly, Your Honor. So the way that you presented the argument in your brief, the part that gets you the closest to three kilograms is the gallon. That gets you 2,750 grams. Right. So that gets you pretty, that's the bulk of it. In other words, you're not going to get there but for that. That's right. Okay. So on the gallon, what is there in the record that supports the gallon and that marries with the way the District Court, this kind of top line that the District Court articulated in support of this three-kilogram threshold? Because what I see is one quote that said, I had a whole one there this time. And then that alone, there's no testimony about, that I could find about what a whole one means. A whole one what? Your Honor, it was the government's position that a whole one was a gallon because of the expert's testimony, which was that if you're going to go to the expense of $32,000 to $36,000 a gallon to ship it from the West Coast, that you were indeed going to get a large amount. And his experience. I didn't even see anywhere, but you can definitely correct me. I didn't see anywhere where the government actually said that a whole one means a whole gallon. It's my understanding that throughout the case, the government was the government's position was that a whole was indeed. But I mean, it might be the position of somebody's own mind, but I'm just looking for something. And is there, was that ever articulated anywhere that a whole one means one means one gallon? I don't believe that there was testimony that a whole is a gallon. And was it in a sentencing memo? Because I don't think I saw it in the government's sentencing memo either. The government referred to one gallon, but I don't recall any statement in the government sentencing memo that a whole is equivalent to. So, where are we getting this argument that the government's position has always been that a whole one is a gallon because the government never said that out of their mouth in the district court or on the page recall the closing argument. And I'm sorry, I don't have a site right at my fingertips, but the, the arguments that the government was making definitely were that he was getting based on the expert testimony that he's getting at least a gallon from the West coast. Cause that's in line with what. So one, one thing that I thought was interesting is that the brief doesn't say at least a gallon, it says one gallon. So I mean, I think the expert said that his, that in, in his experience that the suppliers are the people who were drug dealers in DC, when they ordered from the West coast, they would get at least a gallon sometimes more, but that in his experience, it was mainly that he had seen one gallon. Right. And so then the government's theory was that Johnson got one gallon, right? Between July that he ordered, I believe it was around the end of August. And our, our main support for that is the call that he had with Mr. Prelo on the 22nd of August, 2017. And that's saying that joint appendix six 64 through six. That's the statement. I had a whole one on there. That's right. And I shouldn't say that it was our position that he only received that one gallon. So to the extent that I may have indicated that earlier, that's not correct. Cause there were additional statements in there in that same call, indicating that he had done this three times previously. This is a call. If your honor will recall that he has first realized that day, August 22nd, that the money he has given to the, the suppliers from the West coast, he was expecting that supplier to come visit him. And then he got on social media and realized after the supplier failed to visit him, that they had in fact gone back to the West coast without delivering the drugs at that time. Right. But in your brief that you did, the prior stuff is in a footnote and what, but no 26 on page 49. I see. And so what you're really relying on in principle force is the one gallon. For the one gallon. We're saying the whole on page six 64, and then on page six 68 of that same conversation, Mr. Johnson is going on to say that I ran a certain amount three times, you know, and then saying that's in a footnote, that's in a footnote and on the, on the whole one, I still, if there's nothing that the government ever said, not a thought it, but the government said on the written page or an argument that a whole one means one gallon. And why did, how do we reach the conclusion that the shipment was in fact a gal? Well, we did say at the sentencing, your honor. And of course I would like to point out to the prosecutor told the court at the sentencing, it was prepared to discuss the actual drug quantities. The court did not take prosecutor up on that, but at the end of the sentencing, when they were talking about the government's position that Mr. Johnson should get a 405 month sentence, the government did know Mr. Johnson's acquisition of a gallon of PCP. That's at page one 59 of the government supplemental appendix. And then also mentioned drug expert Cardinals trial testimony saying that when you receive a gallon that you would take that gallon of PCP in order to make that any profit after paying up to $36,000 to ship it from the West coast. A dealer would, or who is supplying others would then cut that to make it two gallons, which is supported by the expert's testimony. So in that sense, we did talk about the acquisition of the gallon. We didn't at that point say a whole equals a gallon, but it's quite clear that we're talking about that gallon being discussed. Right. But I think that, I think there was arguments that at least a gallon was, and maybe just one gallon was received, but I didn't see anywhere is something that tied the comment, the statement, the whole one to one gallon. I didn't see anywhere that the government said what is meant by the statement. A whole one is one gallon. I don't recall a statement as specific as your honor said, but I would just point out that at the sentencing, we were talking about the acquisition of a gallon and we had put in the testimony at trial of the August 22nd call. So, so help me understand some. The draft pre-sentence report is submitted to the parties and it says that Mr. Johnson is responsible for over three kilograms PCP. There's a written objection that's filed to that. It says, no, the jury only made findings set with support over one kilogram. And the government's opposition, as I read it, didn't explain any more than the draft pre-sentence report as to how we got to the three kilograms. Am I missing something? I don't recall anything specific in the government's sentencing memorandum that went through that calculation in regard to one gallon. I recall there being additional, we made a more general reference to wiretap supporting that. That a gallon was delivered. And then went into discussions about the 32 ounce sale in July, 2017. And then the additional arrangements for at least. So basically the government's theory below was that if we find, if the district court were to find it, you got a gallon and that would have been around shortly before the arrest. And then there was a prior sale of 16 ounces, or even that that would be sufficient in and of itself to get you over the three kilograms. Plus 16, but the government would say there were a couple of more transactions that were portable by the wiretaps, 16 and an eight, whatever. We were saying that there was a 32 ounce sale in July, 16 each to Mr. Gage and then to Mr. Tabron and then an additional arrangement where Mr. Johnson was selling an additional eight ounces to Mr. Gage. And then the government would say,  you know, it's not necessarily that you always get a gallon. You can get a half gallon. He said that was possible. And in, in from the wiretaps, it appears that, that, that Mr. Johnson was searched and arrested within maybe two days of getting the ship. I believe it was four days. The drugs came on the ninth and he was arrested on the night of the 13th. And there were additionally two situations in between there where he's meeting with Mr. And he's also arranging to meet somebody who was not identified who said that they were by the shrimp boat. And they were, he was clearly in those calls going to bring drugs. And what he's got is less than a half gallon. When, when, when the search is, right. And I'm sorry, your honor, I haven't done the conversion to what 1429 grams would be back into gallons. But he did, there were 1429 grams of PCP found in the 36 bottles in his. And that had been diluted down. Right. It was 12% purity. I think I, I don't know what your level he got it at, for instance, but there's certainly evidence that he was, what's the evidence about what purity level you would get from the West coast. And you're down. I don't recall there being testimony about the purity level of what we'd normally received from the West coast. And certainly there was evidence that Mr. Johnson did at the, the PCP, because there was starter fluid bottles found in the apartment. I don't recall that.   I think it was a gallon on the ninth. Well, that's my point. Is let's suppose he got a gallon. And he cut it. So that he would have to go. And then he could sell that. So how is it. That he gets a gallon on the nine, he cuts it to make it two gallons for some. Greater quality. And you got evidence of maybe a couple different. Sales. But yet, they only find about a half gallon. At his house, if he started out. I don't recall there being any evidence in the record of him specifically cutting this shipment. So, I don't know. Let's suppose he did. Suppose he didn't. Then, then he sold a half gallon between the ninth and the 12th. According to your theory, which is. Go when, when. Your evidence is. Two transactions of not nearly that amount. Well, the evidence is a call with Mr. Prelo on the 11th, which is a joint appendix for 744 and a call with. An unclarified person, which is supplemental appendix 88 through 91. Where he's, he's. Here's to be making a sale. But the point is, your honor is the question is. That you just needed at least 3 kilograms of a mixture and substance that contained. So, whether or not it's been cut or not. During that time, you still have given the calculations that page 49 of our brief, we still had over 3 gallons. I understand. That are over 3 kilos, but my, my point is that. Even if it's never been cut. And he gets a gallon. On or about October, the 9th on the 12th, he's got about a half now. So, so, so. Well, 2700 grams, according to you is, is, is the gallon. Yes. Translates into 2700 grams and he's got about. 1400 or so. Rams, that's about a half gallon. So, even if nothing was cut. Then that means a half gallon was sold or given, or something happened to it in those 3 days between. In acquiring it in the search warrant being executed. And. And. The. I guess all I'm saying is, is that how does that line up with the evidence of what he was doing with? In those 3 days. And it doesn't seem to line up. But we would say that it does line up because of the, of the calls that I mentioned before with Mr. And then the additional person saying that they were, they were going to meet. And, and, and the discussions of those. I thought that the discussions, at least with Mr, what's his name? Mr. Praline. Um, we're. A pretty small quantity and he's, he's, he's arrested with something like 16 ounces. Right. Several days later, he was arrested with, I think it was. In other words, those discussions that you're relying on, don't get you to the entire rest of the half gallon. They get you. They don't mention specific quantities that would, there's no reason to think. That it encompasses, there's no affirmative reason to think that those discussions encompass. Let's just. Stay with the math that encompasses the entire rest of the half gallon. Or even something close to it, because we're talking about what was ultimately found as an ounce. Pretty small ounce quantities. It's not entirely clear what amounts were, were passed over at that time, but it's also though, I think it's very important to note too, that you're talking about what, what. Is he responsible for? It doesn't mean that if you're found with half a gallon in the end, that that means that's all that you. Sure. Because, because if you got, I mean, I think it's true that if you got the full gallon and the 22 ratio works, that gets you pretty close. And the question becomes, is there enough evidence to support that? In fact, the full gallon came to him and we believe there is given the calls and given the amount that was found on him at that time. And indeed, as your honors have pointed out, the additional drugs that were found on Mr. Very low, which we had obviously point would have been that that was from the gallon. But again, we're, we're dealing with a preponderance of the evidence standard here, which the court used and the government used and met. And additionally, we have in this case, a situation where there. We've got a review of finding. And the finding is that there were multiple discussions of gallon. Right. That's the finding that the district court may. Then that's what the district court said, your honor. But I think that the true point here is not the number of discussions that we've had. The question is what was discussed in here. It is. All on August 22nd shows full, which the government had interpreted as. And that's based on the expert's testimony. But nobody made that argument. At the sentence. Well, we, we said at the sentencing that Johnson had acquired a gallon. But you didn't say because he said that he was getting a whole. We did not say that. I mean, how are we supposed to know what this mean? We're a quarter review. How are we supposed to know what the district work? Actually found where. PSR doesn't articulate a theory. As to why there's three kilograms or more. The government's theory doesn't appear that it articulated. In argument or at in a sentencing memo, doesn't appear to match up with what the district court found.  how are we supposed to review that? There was additional evidence in the PSR, your honor, which the court adopted in its statement of reasons afterwards, talking about the phone calls on the 26th, the 28th of July supported the additional 40 ounces. And then there was discussion of the wire tap supporting the larger amounts. And I will say that it did not specify an amount in that situation, but. We did lay out at sentencing as best we could since the court did not take us. To explain each of the actual drug quantities. That we were prepared to explain. But the evidence that we've stated here today about prior transactions, the whole. And then the receipt of drugs in October, plus the. The transaction, you're kind of making it seem like this is the district judges fault because he wouldn't let you argue what you wanted to argue. But that's why you file a sentencing. We put in the record, what needs to be put in the. And make the argument. So maybe I'm sensitive. But you seem to be throwing the district judge. This was something that was in. I certainly don't mean to. Apologize. I've made it sound like that. But given, we would just say that the evidence that was at trial, the court's statements at the sentencing itself. He mentioned knowing of gallons and other quantities of PCP, which would be an apparent reference to the July sales and the, at least the amount that came at the end in mid October. That there was a sufficient finding, particularly by. The evidence is certainly in the record. And if I may just. Can I just ask you just to simply just address this? Suppose let's just assume. You'll resist it, but let's just assume. That the reference to a whole one means nothing. Because there's nothing that ties a whole one to some quantity. It could be a whole gram. It could be a whole ounce. Let's just let's just assume that away. If we assume that away. Then how do we sustain? The three kilograms that's predicated on a gallon. And how do we sustain that? It would really be on the experts testimony that when somebody is being supplied. PCP from the West Coast, which is clear from the calls that. In the experts experience that gallon was the most common amount. And is that the government's position that that. Even if you totally discount the whole one, because there was never link. Made to what a whole one means. That we affirm a district court's finding of three kilograms. That's as the district court described it based on testimony. And I can't remember exactly how the district court articulated. But that what we do is we sustain it based on the government's experts testimony. That it's typically at least a gallon, but sometimes a half. Yeah, and I would say that the reference to half gallon was a very minor one. The expert was saying also that sometimes he's seen, you know. Two gallons as well. So, but in his experience, his most common experience in this area. Okay, that he was going to you would get a gallon. Okay. Thank you. Thank you. If I just may make one brief point about control of Miss Johnson. Just the defense counsel has said that this was a one-off episode. And I just wanted to make clear that this was not. We mentioned a September 11 text that Mr. Johnson sent to Mrs. Johnson. Saying that he needed to get into the apartment because he needed to make some hits. So, I do have a couple of questions about that. So, all the, it is a, it's a husband and wife who are talking. They were, but they were estranged. I get that. But still, I mean, they are husband and wife. And just, it's typically in these kinds of situations where you have a manager-supervisor relationship. There's something more than this. I mean, this is the kind of discourse that often happens among people who share a house. It doesn't strike me as obvious that somebody's managing somebody else with whom they share a place. And especially if they're in a spousal relationship. And yes, they're estranged, and so you can say, well, they didn't really share this space. But they have some joint dominion and control over it. And it just struck me that the kinds of conversations that are going on are typically the kinds of conversations that occur among spouses. I need you to do this for me. I need you to, I need you to make sure my, you know, my dinner's warm by the time I get home. It's just, that's not, nobody would say that somebody's managing their spouse. That's just the way that spouses talk to each other. So when the evidence came in, first of all, Your Honor, I want to make clear that they were not only estranged, but they were not living together. Only Mrs. Johnson was in that apartment. And on several occasions, including September 11th, and I believe it was October 9th, he was saying, you need to let me in. So this isn't even a situation where he apparently has a key to the apartment. He can't even go there on his own. And it's not just a please warm up my dinner kind of conversation. These are texts and wiretap calls where he's ordering her to bring him his cooler, his bottles, his funnels. He's insisting that she let him come over to the apartment that night, which was, I believe, on the 11th. Is that not how estranged partners or spouses talk to each other? It just seemed typical of the way people might interact without having a managerial supervisory relationship. The reason he's making these insistences is that he needs to get to his drug paraphernalia. He needs to get his bottles. He needs to get his cooler so he won't be able to smell the PCP when he's transiting it. And it's clear that all his conversations in telling her what to do are related to the drug transactions and his desire to get these items out on the street. And it's not a matter of just insisting certain things. He's saying, you've got to bring my gun downstairs. You've got to get the cooler into the back of my Cadillac and so forth. And she clearly acceded to this, even though it didn't seem like she wanted to at times, which again just shows that he is controlling her. And it was neither a one-off experience nor was it a situation where this is just a normal situation between husband and wife just talking whether they're estranged or not. They're specifically, he's ordering her around in regard to his drug trade. And that was, I believe, the managerial supervisory relationship. What of the argument that even if we were to accept that, it's at most a two-point enhancement instead? But it applies for the three-point enhancement because all you have to do is manager supervise one person who is criminally responsible for the offense and a criminal activity that included five or more people. So it meets all the requirements for a subsection B enhancement for three levels. Certainly, if there was some reason to in this case, it would be possible to apply the level two enhancement under subsection C. But given that the government showed by preponderance of the evidence and the court accepted it on that standard, there's no reason to disturb the client. And I would just know one final, final point is that there is a case law, including the Clark decision, that indicates that just because you're somebody's relative, you can still be in that manager supervisor position. So we would respectfully request that the court affirm the judgment of the district. Thank you. Thank you, counsel. Mr. LaCar, we'll give you two minutes for rebuttal. Let me see if I can get it done in one minute. Good. Thirty-five years of a man's life, a de facto life sentence hangs on Delphic discussions and unfounded findings by the district judge. And I noticed that we've had three Circuit Court of Appeals judges of the second most powerful circuit in this country for 40 minutes trying to interpret a money record. This is not, that's not the role of this court. This case could be remanded for all and all reasons, but certainly as to the relevant conduct. Government counsel couldn't say, and to her credit she strove mightily, she couldn't say it's not, she said it's not entirely clear. It's not specific. The findings on relevant conduct, very driven by the government over trying the case and by the government sentencing memorandum, has portrayed my client wrongfully as a supplier for this whole network, which certainly was a large network. Has the managerial role let me in? You have to let me in? Weaver, Weaver answered that. The one-off episode, she was not, nothing that she did, nothing that Karen Johnson did facilitated the offense that my client unfortunately engaged with. I thank you. Thank you, counsel. Thank you. I don't believe so. Thank you, counsel. Thank you to both counsel. We'll take this case under submission. Mr. LaCar, you are appointed by the court to represent Appellant in this matter and the court thanks you for your assistance.
judges: Srinivasan, Wilkins, Tatel